1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   KEVIN KEITH SELLERS,                          Case No.    13cv01017 DMS (PCL)

12

13                            Petitioner,

14                                                 **REPORT AND RECOMMENDATION
                                                   OF UNITED STATES MAGISTRATE**
15          vs.                                    **JUDGE RE DENIAL OF PETITION
                                                   FOR WRIT OF HABEAS CORPUS**
16   CONNIE GIPSON, Warden,

17                            Respondent.

18

19          This Report and Recommendation is submitted to United States District Judge Dana M.

20   Sabraw, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States

21   District Court for the Southern District of California.

22   **I.      FEDERAL PROCEEDINGS**

23          Kevin Keith Sellers ("Petitioner"), a state prisoner proceeding pro se, has filed a Petition

24   for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ["Pet."], challenging his San Diego

25   County Superior Court conviction in case number SCD216892. (ECF. No. 1.)  On December

26   10, 2009, Petitioner was convicted of five counts of first degree robbery of an inhabited

27   dwelling, one count of burglary, five counts of assault with caustic chemicals, five counts of

28   making criminal threats, one count of forcible rape, one count of forcible rape while acting in

concert, and one count of attempted sodomy by use of force, in addition to true findings on firearm use allegations and allegations that the sexual assaults were committed during a burglary and involved tying or binding the victim. (Lodgment No. 1, Clerk's Tr. ["CT"] at 474-530; Lodgment No. 6.) The trial court later dismissed the conviction for forcible rape as being a lesser included offense of the conviction for forcible rape in concert, and Petitioner was sentenced to a determinate term of 51 years and 4 months, plus a consecutive indeterminate term of 25 years to life. (CT 531-37; Lodgment No. 6.)

Petitioner claims that his federal constitutional rights were violated, and therefore his custody is unlawful, because: (1) the evidence was insufficient to support his conviction for forcible rape in concert, (2) the trial court erred in failing to give aiding and abetting jury instructions with respect to the charges of forcible rape in concert, and (3) the trial court erred in denying the motion for a new trial based on juror misconduct. (Pet. at 26-62.)[1]

Respondent has filed an Answer to the Petition ["Ans."] accompanied by Memorandum of Points and Authorities in support ["Ans. Mem."], and has lodged portions of the state court record. (ECF Nos. 3-4.) Respondent contends that federal habeas relief is unavailable because Claim Two is procedurally barred and because the state court adjudication of all three claims was neither contrary to, nor an unreasonable application of, clearly established federal law, and did not involve an unreasonable determination of the facts. (Ans. at 3, Ans. Mem. at 8-9, 16-32.) Petitioner did not file a Traverse. Based upon the documents and pleadings presented in this case, and for the reasons set forth below, the Court recommends that the Petition be **DENIED**.

## II.    <u>STATE PROCEEDINGS</u>

Petitioner appealed his conviction to the California Court of Appeal, Fourth Appellate District, Division One, case number D058346, raising the same three grounds for relief that he presents in the instant federal Petition. (Lodgment No. 3.) Appellant's opening brief was filed on May 13, 2011, Respondent's brief was filed on October 13, 2011, and Appellant's reply brief was filed on November 3, 2011. (Lodgment Nos. 4-5.) The Court affirmed Petitioner's

---

[1] Page numbers for docketed materials cited in this Order refer to those assigned by the Court's electronic case filing ["ECF"] system.

conviction and sentence in an unpublished opinion filed on May 18, 2012.  (Lodgment No. 6.)

On July 2, 2012, Petitioner filed a petition for review in the California Supreme Court, which

was denied on August 29, 2012.  (Lodgment Nos. 7-8.)

### III.   TRIAL PROCEEDINGS

The following facts are taken from the California Court of Appeal opinion in People v.

Sellers, No. D058346 slip op. (Cal. Ct. App., 4th Dist. Div. 1, May 18, 2012).  (Lodgment No.

6.)  This Court gives deference to state court findings of fact and presumes them to be correct.

Sumner v. Mata, 449 U.S. 539, 547 (1981) (stating that deference is owed to factual findings of

both state trial and appellate courts); see also Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir. 1990)

(holding factual findings of state trial and appellate courts are entitled to presumption of

correctness on federal habeas corpus review).  The factual history provided by the state appellate

court is lengthy and detailed and is recounted below in its entirety.

*Prosecution Case*

On October 17, 2008, at approximately 8:30 p.m., Yoshi Nguyen was at the home where he rented a room from K.D. and his wife, H.P.  Two men armed with guns, Tommy Nguyen[FN2] and Sellers, arrived at the house.  They saw Yoshi, covered their faces, and ordered him to be quiet and turn around.  They forced Yoshi into a back living room, covered his head with fabric, tied his hands behind his back, tied his feet, and forced him to lie on the floor.  One man put a gun to Yoshi's head and threatened to shoot him.  The gunmen covered Yoshi's head with another material to further prevent him from seeing, and wrapped a metal chain around him.

[FN2] Yoshi, Tommy and Trieu Nguyen share the same surname; therefore, we refer to them by their first names for clarification.

Yoshi heard the gunmen round up his roommates, Tam Pham, Hung Tran, and Trieu Nguyen, who were made to lie next to him.  Approximately 15 minutes later, Vanna Chheuni joined the gunmen and guarded the victims.[FN3]  The gunmen demanded the victims' money and searched their bedrooms.  Sellers or Tommy ordered Chheuni, "Keep an eye on them.  They move, shoot them."  Yoshi testified he believed it was more likely there were only three robbers, two males and one female.

[FN3] Chheuni, who Sellers held out as his wife, was tried as Sellers's codefendant.

H.P. and her husband arrived home at approximately 11:25 p.m.  H.P. testified that as she entered their house, a man with his face covered pointed a gun at her, warning he would shoot her if she turned on the light.  The man asked for money, grabbed her purse which contained almost $1000, pushed her to the ground, covered her head with a T-shirt, and tied her hands and feet.  A second

man ordered her husband into the house.

The first man, who appeared to be Asian, dragged her into the master bedroom, held her at gunpoint and raped her. H.P. was on her back and her blindfold slipped, and she managed to see the man, whose face cover was removed. When he finished raping her, he said two other men with bigger penises were waiting their turn outside. He left the room and whispered something to a second man, who entered the bedroom.

H.P. identified the second man based on his physical differences: "For one, the bathroom light was on, and I was moving my head to a degree that the T-shirt was kind of off of my face, so I could see the skin is not dark and not white, it's like half of that." Also, he tried to insert his penis, which was bigger, into her anus. He refused to stop, and slapped her face. He continued to insert his penis halfway and she screamed so loudly that he withdrew his penis. He demanded her money, asked for her safe box, and threatened to cut off her hand so she could not "work on nails anymore." She described his voice as sounding, "half Black, half Mexican."

When the second rapist left the room, she dialed 911 and left the phone off the hook.[FN4] Afterwards, her foot hit something that made a noise. Tommy and Sellers ran into the room and told her they were going to shoot her dead immediately. H.P. testified, "One slapped me and used the T-shirt and pushed the whole T-shirt inside my mouth. And then one covered my head as if they were going to shoot me. They used a pillow case."

> [FN4] A recording of H.P.'s 911 call was played for the jury, who heard the gunmen's voices as they told H.P. to sit down, and one man asked for his other gun.

Afterwards, the gunmen herded all the victims into a room, threw gasoline on H.P., her husband and the others, and threatened to burn them if they did not give them money. One gunman said something like, "'We are going to burn you guys. This is your last chance.'" Yoshi also heard the robbers lighting a lighter. Immediately following that, the police arrived.

Police officers testified they reached the house around 12:20 a.m. Chheuni walked out of the house and police detained her. Minutes later, Tommy walked out and fled when he saw police, but he was caught. Police also apprehended Sellers as he fled the house carrying $1200 in cash. Police found stolen cell phones, electronic equipment, including computers, jewelry and other items that the robbers carried on their persons or had set aside on the floor in the front living room. Police found a used condom near the spot where they had detained Sellers.

Danella Kawachi, a sexual assault nurse examiner, collected DNA from Sellers's mouth, penis and scrotum. David Cornacchia, a lab technician, testified that the outside of the condom had DNA matching that of H.P. and her husband, and it was inconclusive whether Sellers was a DNA contributor. The inside of the condom contained DNA matching that of H.P. and Chheuni, and that DNA was very similar to DNA taken from Sellers's penis. Any DNA from Sellers found inside the condom was relatively small compared to the DNA found matching H.P. and Chheuni. Cornacchia agreed with the prosecutor that the most likely explanation of the lab results was that "somebody used that condom and had sex with [H.P.,] who had had sexual intercourse with her husband the day before or days before." Further, Sellers might have had sex with Chheuni recently, and her

4

DNA remained on his penis. The relative absence of Sellers's DNA from inside the condom was partially explained because no sperm cells were found inside the condom, indicating it was unlikely Sellers had ejaculated inside it.

*Defense Case*

Sellers testified he had accompanied Tommy, Chheuni and a male friend of Tommy's to the house and stayed there for approximately three hours before H.P. and her husband got home.[FN5] Sellers did not know Tommy's friend before that day, and could not physically describe him, except to note he appeared Black or Hispanic.[FN6] Sellers acknowledged he participated in the robbery, and a surveillance video photographed him at H.P.'s house.

[FN5] Although Sellers claims Tommy's friend accompanied them, he could not describe the friend, despite the fact they had spent more than three hours together in the drive to H.P.'s residence and when waiting for H.P. to arrive home. Further, the trial court concluded the victims' evidence showed there were only two gunmen. In denying Sellers's new trial motion, the court stated: "Throughout the testimony of the victims, they were consistent [with] what they saw and heard. They never said that there was a third person. When the homeowners arrived to the house, they were confronted by two men with guns. [¶] There was never any talk of a third male with them. There was never any evidence of a third male with them."

During sentencing, the court also commented on Sellers's lack of credibility: "[Sellers] also was, I think, not candid and not truthful in every opportunity he had to speak about what happened that night. [¶] When he spoke to police initially, his words were untruthful, and he admitted it later on. And then his statements evolved. They reached, in this court's mind, a zenith when he testified. [¶] And I think I would be derelict if I didn't say, without trying to be provocative or belittling, the court found that Mr. Sellers's testimony was a carefully crafted fabric intended to explain away scientific evidence that, by the time he gave that testimony, he knew existed. It was almost like a pinball in a pinball machine, where it bounced from point to point and [he] tried to explain away each one of the scientific circumstances that would point to his culpability, certainly, of the sexual assault on [H.P.]. [¶] I find that testimony, which he was privileged not to give, is nothing less than an obstruction of justice and an aggravating factor."

[FN6] According to the probation report, Sellers is Black and has hazel eyes.

Sellers denied raping H.P. or knowing about it while it occurred. He claimed to be guarding the other victims in the living room area when he heard H.P. scream as she entered the house. According to Sellers, Tommy and his friend detained H.P. and her husband on the floor, and Sellers did not see what Tommy did with H.P. afterwards, but he heard H.P. saying "not to hurt her." Sellers said Tommy's friend brought H.P.'s husband to join the other victims. Afterwards the friend left and, Sellers assumed, rejoined Tommy. Sellers asked Tommy's friend what Tommy was doing, and the friend said "not to worry about it." About 15 to

20 minutes later, both Tommy and his friend joined Sellers. However, they heard a noise coming from the master bedroom, and Tommy and his friend ran to see what was going on. Sellers followed them a few seconds afterwards, but they closed the door on him. Sellers returned to the dining room. After a while, Tommy and his friend returned to the living room and escorted the victims to the master bedroom.

Sellers admitted that before police arrived he had collected evidence of his presence in the house, including cigarette butts, bottles of alcohol he had drunk, and he had wiped the objects he had touched because he did not want to leave behind fingerprints or DNA evidence. Sellers denied knowing anything about the condom, putting it on the ground or knowing how it got there. He did not know how Chheuni's DNA got on it. He admitted having sex with Chheuni the night before the incident.

Sellers admitted that he told police who captured him, "'You won't find my fingerprints or DNA anywhere'" in the residence. Sellers admitted lying to police to get out of trouble, including by denying knowing H.P.'s house or knowing what had happened there. He lied by saying the money found on his person belonged to him. The prosecutor asked Sellers on cross-examination, "But as you sit here today, . . . [y]ou know fingerprints were found in the house. You know that your shoe prints were found in the house. You know that [H.P.'s] DNA was found on your penis and your scrotum. And you know that this condom was found with [Chheuni's] DNA and [H.P.'s and her husband's] DNA, correct?" He replied, "Yes."

(Lodgment No. 3, <u>People v. Sellers</u>, No. D058346, slip op. at 3-8.)

## IV.   **SCOPE OF REVIEW**

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

As discussed in detail below, the claims presented in the federal Petition were adjudicated on their merits in the state courts. As amended, 28 U.S.C. § 2254(d) now reads:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West 2006).

Because his claims were adjudicated on the merits in state court, to obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2).  See Williams v. Taylor, 529 U.S. 362, 403 (2000).  The Supreme Court interprets § 2254(d)(1) as follows:

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguish-able facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-13; Lockyer v. Andrade, 338 U.S. 63, 72-73 (2003).

Federal courts also look to Ninth Circuit law for persuasive authority in applying Supreme Court law, and to determine whether a particular state court decision is an "unreasonable application" of Supreme Court precedent.  Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 770, 786 (2011), quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

**V.    DISCUSSION**

As noted above, Petitioner claims that his federal constitutional rights were violated, and therefore his custody is unlawful, because: (1) the evidence was insufficient to support his conviction for forcible rape in concert; (2) the trial court erred in failing to give aiding and abetting jury instructions with respect to the charges of forcible rape in concert; and (3) the trial court erred in denying the motion for a new trial based on juror misconduct.  (Pet. at 26-62.)

**A.    Claim One - Sufficiency of the Evidence**

Petitioner contends in Claim One that his conviction of forcible rape in concert should be reversed "because there was insufficient evidence [he] committed this offense as either a direct perpetrator or aider and abettor."  (Pet. at 28.)  He contends that "he was merely present

and mere presence is not enough" for a finding of guilt under either the direct perpetrator or aider and abettor theory of forcible rape in concert.  (Id. at 38.)  Respondent argues that there was sufficient evidence to sustain the conviction of forcible rape in concert under either possible theory of the crime, as the evidence showed both that Petitioner aided and abetted Tommy Nguyen's rape of the victim and that Petitioner personally raped the victim. (Ans. Mem. at 21-22.)  Respondent maintains that the state court's rejection of this claim on the merits was not contrary to, nor an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts.  (Id. at 18.)

Petitioner presented this claim to the California Supreme Court in a petition for review. (Lodgment No. 7 at 7-16.)  The state supreme court denied the claim in an opinion stating in full, "The petition for review is denied. Werdegar, J. was absent and did not participate." (Lodgment No. 8.)  Thus, the Court must "look through" that opinion to the state appellate court's reasoned resolution of the claim.  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them *no effect*- which simply "looks through" them to the last reasoned decision- most nearly reflects the role they are ordinarily intended to play.") (italics in original).  The state appellate court denied the claim, stating in part:

> In order to be found guilty of the crime of rape in concert, a defendant must, "voluntarily acting in concert with another person," commit the crime of rape "by force or violence and against the will of the victim." (§ 264.1.) He may do so "either personally or by aiding and abetting the other person." (*Ibid*.)
>
> One who aids and abets another in the commission of a crime is guilty of the crime, even if the other commits some or all of the acts constituting the crime. (§ 31; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) Liability as an aider and abettor attaches if the defendant knew the perpetrator intended to commit the crime and the defendant intended to, and did, encourage or facilitate the perpetrator in committing the crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 561; *People v. Keovilayphone* (2005) 132 Cal.App.4th 491, 497.) Whether a defendant aided and abetted the commission of a crime is a question of fact that may be proved by circumstantial evidence (*Beeman*, at pp. 559-560; *People v. Pitts* (1990) 223 Cal.App.3d 606, 892-893); and on appeal we must resolve all conflicts in the evidence and draw all reasonable inferences in support of the judgment. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) "Among the factors which may be considered in determining aiding and abetting are: presence at the crime scene, companionship, and conduct before and after the offense." (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.) Other relevant factors include the defendant's failure to take steps to prevent the crime and flight from the crime

13cv1017

scene.  (*People v. Jones* (1980) 108 Cal.App.3d 9, 15.)

Applying these factors, we conclude there was sufficient evidence from which the jury reasonably could infer Sellers committed rape in concert in both ways defined by the statute.  First, he personally raped H.P. as shown by evidence that the condom was found near where Sellers was arrested.  The condom tested positive for Chheuni's and H.P.'s DNA.  Sellers admitted he had had sex with Chheuni the previous night.  The lab technician explained this likely accounted for her DNA inside the condom.  Sellers's forcible sexual intercourse with H.P. would explain her DNA appearing on the outside of the condom.  H.P. testified two different men had raped her, and she could tell them apart by their voices, ethnicity, and different penis sizes.  The second man, who the jury could reasonably infer was Sellers, slapped her and ignored her plea to stop hurting her.  Such testimony satisfied section 261, subdivision (a)(2)'s definition of rape as an act of sexual intercourse accomplished against a person's will by force or violence.

Second, the jury could infer Sellers committed rape in concert by aiding and abetting Tommy.  Sellers testified he had heard H.P. screaming, and later pleading with Tommy not to hurt her.  Nevertheless, according to Sellers's own account, Sellers did nothing to investigate how H.P. was being hurt, and much less help her.  Rather, Sellers claimed, he opted to guard the other victims while Tommy was with H.P.  In so doing, Sellers prevented anyone else from helping H.P. and thereby assisted Tommy in carrying out the rape.  (See *In re Juan G.*, *supra*, 112 Cal.App.4th at p. 5 [presence at the crime scene is one factor relevant to aiding and abetting]; *People v. Jones*, *supra*, 108 Cal.App.3d at p. 15 [failure to prevent the crime is a factor in determining aiding and abetting].)  The jury was instructed it could infer consciousness of guilt from the fact Sellers had lied to police (CALCRIM No. 362) and fled the crime scene (CALCRIM No. 372).

We note that Sellers, in the context of his claim regarding instructional error, concedes the jury could have concluded that sufficient evidence supported the rape conviction: "Although there may have been sufficient circumstantial evidence to support [his] convictions, sufficiency of the evidence is not the standard of review for federal constitutional error.  Rather, respondent must demonstrate, beyond a reasonable doubt, that this jury surely would have found appellant guilty absent the error."

(Lodgment No. 6, <u>People v. Sellers</u>, No. D058346, slip op. at 8-11.)

In reviewing a claim of insufficient evidence to sustain a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  A habeas petitioner is not entitled to relief unless "it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  <u>Id.</u> at 324.  Because this petition is governed by AEDPA, in order to merit relief, Petitioner must also demonstrate that the state court's adjudication of his claim involved an objectively unreasonable application

1    of <u>Jackson</u>.  <u>See</u> <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005) ("After AEDPA, we

2    apply the standards of <u>Jackson</u> with an additional layer of deference.")

3         In this case, the state appellate court stated that it must determine "whether, after viewing

4    the evidence in the light most favorable to the People, any rational trier of fact could have found

5    the essential elements of rape in concert beyond a reasonable doubt."  (Lodgment No. 6 at 8,

6    citing <u>Jackson</u>, 443 U.S. at 319, <u>People v. Maury</u>, 30 Cal. 4th 342, 403 (2003).)  As the state

7    court explicitly relied upon <u>Jackson</u> itself in making its determination, its decision was not

8    "contrary to" clearly established federal law.  <u>See</u> <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002);

9    <u>Williams</u>, 529 U.S. at 413.

10        Nor was the state court's decision an unreasonable application of clearly established

11   Supreme Court precedent.  In determining whether the state appellate court was unreasonable

12   in concluding that sufficient evidence existed to support Petitioner's conviction, this Court

13   begins with "explicit reference to the substantive elements of the criminal offense as defined by

14   state law." <u>Chein v. Shumsky</u>, 373 F.3d 978, 983 (9th Cir. 2004); <u>Jackson</u>, 443 U.S. at 324 n.

15   16.  Under California Penal Code section 264.1, a conviction of forcible rape by acting in

16   concert requires the prosecution to prove that:

    1.   The defendant personally committed forcible rape and voluntarily acted
       with someone else who aided and abetted its commission;

      Or

    2.   The defendant voluntarily aided and abetted someone else who personally
       committed forcible rape.

21   (Judicial Council of California Criminal Jury Instructions ["CALCRIM"] 1001 (January 2006

22   Edition), CT 0308.)  "Someone aids and abets a crime if he or she knows of the perpetrator's

23   unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote,

24   encourage, or instigate the perpetrator's commission of that crime." (CALCRIM 401; CT 0280.)

25        As the state court concluded, viewed as required in the light most favorable to the verdict,

26   a rational trier of fact could have found that Petitioner was guilty of forcible rape by acting in

27   concert.  First, there was sufficient evidence for the jury to conclude that Petitioner personally

28

13cv1017

committed forcible rape while acting in concert with Tommy Nguyen. Victim H.P.[2] testified that after the first assailant, who she earlier stated was an Asian male, raped her, he left and a second man entered the room; she also heard whispering between two individuals. (Lodgment No. 2, Reporter's Tr. ["RT"] at 393, 400-01.) She stated that the second rapist, who had a bigger penis than the first man, attempted anal intercourse and slapped her when she begged him to stop due to the pain. (RT 401-02.) H.P. stated that he then inserted his penis halfway into her vagina, but again, was too big to continue, unlike the first rapist. (RT 402.) H.P. stated that the second man sounded "half Black, half Mexican," and said that despite the t-shirt on her face, she could see that his "skin is not dark and it's not white, it's like half of that." (RT 403.) As the state appellate court noted, "According to the probation report, Sellers is Black and has hazel eyes." (Lodgment No. 6, People v. Sellers, No. D058346, slip op. at 7 fn. 6, see also CT 380 (probation report).)

Petitioner testified at trial and denied ever being in the bedroom with victim H.P., stating instead that there was a third man, a friend of Tommy Nguyen's, who also participated in the robbery that evening, spoke Spanish to Nguyen, and went into the bedroom after Nguyen exited. However, none of the five victims of the home-invasion testified that they were actually aware of more than three assailants, the two male gunmen and one woman. (See RT 110 (Yoshi Nguyen heard a total of three voices), RT 205 (Tam Pham stated that the assailants included two males and one female), RT 271 (Hung Tran heard a total of three individuals that evening), RT 381 (Kevin Duong heard two voices and sensed the presence of a third person), RT 423-24 (H.P. testified that she told a police officer that during the assault by the second rapist she heard two other voices outside the bedroom.) Moreover, contrary to Petitioner's testimony that he was unarmed that evening, witness Tam Pham identified Petitioner that very evening as the man who had pointed a gun at him. (RT 222-23.)

Yet, on cross-examination, witnesses H.P. and Tam Pham appeared to also allow for the possibility that there may have been more than three perpetrators in the house that evening. (See

---

[2] The Court will refer to the sexual assault victim by first letter of first initial and first letter of last initial only, consistent with the manner of reference utilized by the California Court of Appeal.

RT 241 (Tam Pham), 431 (H.P. sensed "at least three" people in the house).)  However, it is also clear that Petitioner admitted lying to the police on multiple points in an attempt to get out of trouble, and during the sentencing hearing, the trial court specifically commented on Petitioner's lack of credibility, stating that Petitioner was "not candid and not truthful in every opportunity he had to speak about what happened that night" and the judge found Petitioner's trial testimony to be "nothing less than an obstruction of justice and an aggravating factor."  (RT 1196-97.)  Thus, even if this Court were to credit Petitioner's testimony and the two witnesses' allowance that more than three robbers may have been in the house that evening, the Court must presume that this conflict was resolved in the prosecution's favor.  See Jackson, 443 U.S. at 326 ("A federal habeas court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution."); see also McDaniel v. Brown, 558 U.S. 120, 133 (2010) (per curiam).

The physical evidence also strongly supported a conclusion that Petitioner had personally raped H.P.  David Cornacchia, a criminalist with the San Diego Police Department, performed the DNA testing on the items collected in Petitioner's case.  (RT 709-19.)  While no evidence of semen or sperm cells were found on the victim's or Petitioner's swabs, Cornacchia recovered some DNA material from Petitioner's swabs and fingernail scrapings. (RT 722-26.)  Cornacchia testified that DNA from a mixture of three individuals was found on both Petitioner's scrotal swab and penile swab, and stated that victim H.P., Petitioner, and Petitioner's co-defendant/girlfriend Vanna Chheuni were "all included as possible contributors to this mixture." (RT 726.)  Cornacchia also tested a condom found close to the area where Petitioner was arrested and detained.  (RT 739-40, 689, 442-43, 580-82.)  He stated that one side of the condom, the outside as worn, contained a DNA mixture of two individuals to which victim H.P. and her husband were possible contributors, and the other side, the inside as worn, also contained a DNA mixture, of which victim H.P. was the "predominant profile," Vanna Chheuni "was included as a possible minor contributor," and was inconclusive as to whether Petitioner was a contributor.  (RT 741-43; 754-55.)  Cornacchia indicated that the DNA results could be

explained by a scenario in which the perpetrator, who had recent sex with Cheunni, then used the condom to have sex with victim H.P., who previously had sex with her husband sometime in the day or days prior to the robbery and assault. (RT 745-47.) Cornacchia noted that "the DNA results from the swab of the inside of the condom are very similar to the DNA results I got from the swab of Kevin Sellers' penis." (RT 746.) Petitioner testified that he had sex with Chheuni the night before the robbery and admitted that he initially lied about the extent of their relationship. (RT 891, 877, 890.)

In contending that the evidence supporting his conviction is insufficient, Petitioner asserts that the victim "did not identify [Petitioner] as having raped her and did not have anyone's DNA on her. [Petitioner's] DNA was present on his scrotum because he had urinated on himself and, although he had a catheter he wiped himself off with a towel at the scene." (Pet. at 37.) Again, as discussed above, while physical evidence was not recovered from the victim's swabs, DNA consistent with the victim was recovered on Petitioner's swabs. While Petitioner attempts to explain the presence of his own DNA on his penis, stating that he urinated on himself, he fails to explain, as he failed to explain at trial, the three-person DNA mixture that was recovered from his own swabs, which included himself, victim H.P., and Petitioner's co-defendant/girlfriend Vanna Chheuni as possible contributors. Moreover, Petitioner fails to explain how DNA recovered from a condom found in the vicinity of his arrest site contained DNA consistent with H.P. and her husband on one side, and DNA consistent with victim H.P. and Vanna Chheuni on the other side. In any event, with respect to the lack of Petitioner's DNA on the victim or inside the condom, victim H.P. testified that the second rapist did not ejaculate inside her, and criminalist Cornacchia testified that a lack of ejaculation could reasonably explain the absence of the perpetrator's DNA inside of the condom.

Thus, given the physical evidence and the testimony recounted above, viewed as required in the light most favorable to the judgment, a rational juror could have found beyond a reasonable doubt that Petitioner personally committed the forcible rape of H.P. and that he voluntarily acted with Tommy Nguyen, who aided in its commission. See Jackson, 443 U.S. at 319; (CALCRIM 1001.)

There was also sufficient evidence for the jury to conclude that Petitioner aided and abetted Tommy Nguyen, who personally committed forcible rape.  Again, victim H.P. testified that of the two men who raped her, the first was an Asian male.  (RT 393.)  She testified that she heard two men talking during the initial struggle that took place upon entering the house, where one man was talking to her and pulling her into the bedroom, and the other man was talking to her husband.  (RT 396-97.)  H.P. stated that during the first man's assault, she tried to fight and begged him to stop.  (RT 399-400.)  H.P. also testified that the first rapist told her that "there are two other guys out there waiting for their turns and they have bigger penises."  (RT 400.)  H.P. stated that while she did not ever see a third robber, she felt there were at least three people in the house given that when one man was in the bedroom with her, she heard whispering between two others outside the room.  (RT 431.)

At a minimum, the evidence presented allowed the jury to reasonably conclude that Petitioner not only failed to help the victim, but actively prevented others from helping her, which aided and abetted Tommy Nguyen in the commission of forcible rape.  (See CALCRIM 401, CT 280 ("If you conclude a defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether that defendant was an aider and abettor.  [¶]  However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.").)  In his trial testimony, Petitioner admitted that he heard H.P. telling Tommy "not to hurt her," yet did not go to the master bedroom to help her, and instead remained in another room with the four male victims.  (RT 859-60.)

Moreover, in light of the evidence that there were only two male robbers, the jury could have reasonably concluded that Petitioner was also the individual who held H.P.'s husband while Tommy forced her to the bedroom.  Additionally, given H.P.'s testimony that the first rapist taunted her by telling her that other men were waiting for their turn with her, the whispering that she heard occur between the first and second set of sexual assaults by two different men, and the physical evidence supporting a conclusion that Petitioner was in fact the second rapist, the jury also was presented with sufficient evidence to conclude that Petitioner knew of Tommy's

unlawful intentions and intentionally aided and abetted Tommy's forcible rape of the victim.

Based on the facts recounted above and the Court's independent review of the trial proceedings, the Court finds the jury could have reasonably concluded that Petitioner had the requisite knowledge and intent to find him guilty of aiding and abetting Tommy Nguyen in committing forcible rape. The evidence clearly demonstrated that Petitioner and Tommy arrived at the house together, entered the home armed, bound and gathered the three male tenants, and awaited the arrival of the homeowners. Once the owners arrived home, Petitioner admitted that he guarded the male victims, including H.P.'s husband, and that he heard H.P. calling for help and asking Tommy not to hurt her, but stayed with the male victims. Contrary to Petitioner's assertion, the evidence presented at trial does far more than raise a "strong suspicion" of Petitioner's guilt. (See Pet. at 38, citing People v. Williams, 5 Cal. 3d 211, 217 (1971) ("Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction.").)

As recounted above, there was more than sufficient evidence that Petitioner personally participated in raping H.P., as evidenced by the victim's own testimony about the two rapists and their physical differences, as well as by the DNA evidence found on both Petitioner and on the condom recovered near the spot of his arrest. Moreover, there was also sufficient evidence that Petitioner aided and abetted Tommy Nguyen in raping H.P., as the victim testified about the whispering between the assailants, Petitioner and Tommy arrived at the home together, armed, gathered the victims at gunpoint, demanded money, and waited together for the homeowners to arrive home. The jury was also instructed that evidence of Petitioner's false statements to the police and flight from the crime scene could show consciousness of guilt. (RT 960-61; CT 274, 276.) Also, Petitioner himself admitted that he heard the victim's cries for help but declined to come to her aid, and given the evidence demonstrating that there were only two male assailants in the home that evening, a reasonable jury could conclude that Petitioner was guilty of rape by acting in concert under either or both theories of the crime.

Accordingly, the state supreme court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based upon an

1  unreasonable determination of the facts.  Jackson, 443 U.S. at 324, Williams, 529 U.S. at 412-

2  13; Juan H., 408 F.3d at 1274.  This Court recommends **DENYING** habeas relief on Claim One.

## B.   Claim Two - Trial Court Error in Jury Instructions

Petitioner contends in Claim Two that the trial court erred when it "failed to give aiding and abetting instructions as to count 24" and contends that "misinstruction on an element of liability is constitutional error which in this case cannot be deemed harmless beyond a reasonable doubt."  (Pet. at 40.)  Specifically, he asserts that the trial court: (1) failed to advise the jury that Petitioner, as an aider and abettor, could be guilty of a lesser crime than the actual perpetrator; (2) failed to properly advise the jury with respect to the specific intent required under an aider and abettor theory of rape in concert; and (3) failed to instruct the jury that a defendant must both aid and abet the perpetrator to be guilty of aiding and abetting.  (Id. at 40-47.)

Respondent asserts that the claim is procedurally barred, as trial defense counsel's failure to object to the jury instructions as given forfeited the issue and bars appellate review of the claim.  (Ans. Mem. at 23-24.)  Respondent also maintains that the state court's rejection of this claim on the merits was not contrary to, nor an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts.  (Id. at 24.)

## 1.   Procedural Bar

Petitioner raised this claim in his petition for review to the California Supreme Court, which denied the claim without comment or citation to authority.  (See Lodgment No. 7 at 17-29, Lodgment No. 8.)  Because the California Supreme Court did not articulate its rationale for denying this claim, this Court must "look through" to the underlying appellate opinion.  Ylst, 501 U.S. at 806.

The state appellate court held in relevant part as follows:

> Initially, it appears this claim has been forfeited because, as Sellers concedes, he failed to suggest the trial court modify any of the standard jury instructions regarding aiding and abetting. (People v. Hudson (2006) 38 Cal.4th 1002, 1011-1012 ["'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language'"].) However, even if, as Sellers claims, his substantial rights were implicated and he was not

1

required to object at trial (*People v. Salcido* (2008) 44 Cal.4th 93, 155), his claim fails on the merits.

2

(Lodgment No. 6, <u>People v. Sellers</u>, No. D058346, slip op. at 15.)

3

4          When a state court's rejection of a federal claim is based on a violation of a state

5   procedural rule that is adequate to support the judgment and independent of federal law, a habeas

6   petitioner has procedurally defaulted his claim.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-30

7   (1991).  A state procedural rule is adequate if it has been "well-established and consistently

8   applied."  <u>Bennett v. Mueller</u>, 322 F.3d 573, 583 (9th Cir. 2003).  The procedural rule is

9   independent if it is not "interwoven with the federal law."  <u>LaCrosse v. Kernan</u>, 244 F.3d 702,

10  704 (9th Cir. 2001).

11         With respect to Claim 2, Respondent asserts Petitioner's claim is procedurally defaulted

12  and barred from federal court consideration due to trial counsel's failure to object to the jury

13  instructions at trial, citing the contemporaneous objection rule.  The Ninth Circuit previously

14  found this state procedural rule to be an adequate and independent bar to federal habeas review.

15  <u>See</u> <u>Paulino v. Castro</u>, 371 F.3d 1083, 1093 (9th Cir. 2004); <u>Melendez v. Pliler</u>, 288 F.3d 1120,

16  1125 (9th Cir. 2002); <u>Vansickel v. White</u>, 166 F.3d 953, 957-58 (9th Cir. 1999).

17         If a state procedural ground is an adequate and independent ground for dismissal, a

18  federal court will not consider the merits of the claims unless a petitioner can show sufficient

19  cause for the default and resulting prejudice, or show that a failure to consider the claims would

20  result in a fundamental miscarriage of justice.  <u>See</u> <u>Coleman</u>, 501 U.S. at 750.  With respect to

21  the procedural bar, Petitioner contends that "the lack of a defense trial court objection to

22  instructional error does not bar appellate review of this issue.  The challenged instruction

23  affected [Petitioner's] substantial rights."  (Pet. at 40.)

24         Here, while the state appellate court indicated that Petitioner forfeited his claim due to

25  trial counsel's failure to object to the jury instructions as given, the state court also adjudicated

26  the claim on the merits.  Moreover, given the often lengthy and complicated matter of procedural

27  default, particularly an analysis of cause and prejudice, it appears that the interests of judicial

28  economy counsel in favor of reaching the merits of this claim.  <u>See</u> <u>Franklin v. Johnson</u>, 290

F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same."), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be.")  In this case, as discussed below, Claim 2 is without merit, and the Court recommends denying habeas relief on this claim.  Therefore, an analysis of the merits of this claim appears less complicated and time-consuming than a lengthy discussion of cause and prejudice.

## 2. __Merits__

Again, Petitioner raised this claim in his petition for review to the California Supreme Court, which denied the claim without comment or citation to authority.  (See Lodgment No. 7 at 17-29, Lodgment No. 8.)  Because the California Supreme Court did not articulate its rationale for denying this claim, this Court must "look through" to the underlying appellate opinion.  Ylst, 501 U.S. at 806.  In addition to the procedural bar discussed above, the state appellate court denied the claim on the merits, stating in part:

> In light of the totality of the court's instructions and the argument of defense counsel, we conclude the jury was not reasonably likely to misinterpret the court's instructions regarding aiding and abetting.  The jury was fully apprised of Sellers's role in the rape, in comparison to Tommy's role.  Consequently, the jury acquitted him of those rape charges involving Tommy.  As noted, the evidence showed Sellers committed rape in concert in two different ways, that is, by personally raping H.P., and aiding and abetting Tommy.  Sellers was aware H.P. was tied, blindfolded, and threatened with bodily harm.  Sellers did not call police to assist H.P. or allow her to escape, and he did not attempt to dissuade his coparticipants, despite hearing H.P.'s scream and pleas to Tommy not to hurt her.  On this record, any instructional error was harmless beyond a reasonable doubt because the overwhelming evidence established that Sellers committed rape in concert with Tommy.

(Lodgment No. 6, People v. Sellers, No. D058346, slip op. at 16.)

The Supreme Court has held that a federal court may not generally grant federal habeas relief based on errors of state law.  See Estelle v. McGuire, 502 U.S. 62 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.")  To merit federal habeas relief based on a state trial error, a petitioner must demonstrate that the error "so infected the entire trial that the resulting conviction violates due

process." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977), quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973).

Moreover, "'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" <u>Boyde v. California</u>, 494 U.S. 370, 378 (1990), quoting <u>Cupp</u>, 414 U.S. at 146-47. Finally, even if the trial court is found to have erred, habeas relief is unavailable unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 627 (1993).

Petitioner challenges the instructions given with respect to rape in concert and aiding and abetting. A review of the record shows that the charge to the jury included the following instructions:

> A person may be guilty of committing a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.

(RT 962-62; CT 280; CALCRIM 400.)

> To prove that a defendant is guilty of any crime based on aiding and abetting that crime, the People must prove that:
>
> One, the perpetrator committed the crime.
>
> Two, the defendant knew that the perpetrator intended to commit the crime.
>
> Three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime.
>
> And, four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of that crime.
>
> Now, someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose, and if he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.
>
> If all of these requirements have been proved, a defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.
>
> If you conclude that a defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether that defendant was an aider and abettor.

19

However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not by itself make him or her an aider and abettor.

(RT 963-64; CT 280; CALCRIM 401.)

The defendant, Mr. Sellers, is charged in count 24 with committing rape by acting in concert with Tommy Nguyen.

To prove that a defendant, in this case Mr. Sellers, is guilty of this crime, the People must prove that:

One, the defendant personally committed forcible rape and voluntarily acted with someone else who aided and abetted its commission, or the defendant voluntarily aided and abetted someone else who personally committed forcible rape.

To decide whether the defendant or Tommy Nguyen committed rape, please refer to the separate instructions that I have just given you on that crime. To decide whether the defendant or Tommy Nguyen aided and abetted rape, please refer to the separate instructions that I have given you on aiding and abetting.  You must apply those instructions when you decide whether the People have proved rape in concert.

To prove the crime of rape in concert, the People do not have to prove a prearranged plan or scheme to commit rape.

(RT 1003; CT 308; CALCRIM 1001.)

Petitioner first contends that the "trial court's instructions were defective because they failed to give adequate guidance to the jury regarding [Petitioner's] culpability.  This was erroneous because an aider and abettor can also be guilty of a crime that is a lesser offense of the direct perpetrator's crime." (Pet. at 43.)  Petitioner asserts that the trial court "had a sua sponte duty to correctly instruct the jury regarding applicable legal principles by clarifying that the jurors could find him guilty of a lesser offense than forcible rape in concert if they found he had a less culpable state of mind than the actual perpetrator." (Id. at 41.)

"'Failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding.'" Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984), quoting James v. Reese, 546 F.2d 325, 327 (9th Cir. 1976); see also Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) ("Under the law of this circuit, the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question.")  Also, Petitioner fails to

specify any lesser offense that should have been the subject of an instruction, instead generally contending that the trial court's instructions were in error "because an aider and abettor can also be guilty of a crime that is a lesser offense of the direct perpetrator's crime." (Pet. at 43.)

Again, as outlined above, the state record reflects that Petitioner's jury was instructed with the standard CALCRIM 400 jury instruction, which states in relevant part that, "A person is *equally guilty* of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it." (CT 279) (emphasis added.)  California state courts have upheld the use of this language as "generally correct in all but the most exceptional circumstances." People v. Samaniego, 172 Cal. App. 4th 1148, 1165 (Cal. Ct. App. 2009); see generally Smith v. Lopez, ___ F.3d ___, 2013 WL 5303247, *8 (9th Cir. Sept. 23, 2013) ("In California, aiding and abetting a crime is the same substantive offense as perpetrating the crime, so aiders and abettors may be punished as principals.").  The excepted circumstances are only applicable where "the aider and abettor has a less culpable mental state," and may then only be guilty of a lesser offense.  See Samaniego, 172 Cal. App. 4th at 1164-65.  Petitioner fails to persuade the Court that any such "exceptional circumstances" apply in this case, as the evidence clearly shows that he both aided and abetted Tommy Nguyen's rape of H.P., as well as personally committed forcible rape upon H.P., and the jury could have reasonably found him guilty of rape in concert under either or both theories of the crime.  Moreover, the jury was also properly instructed pursuant to CALCRIM 401, which directed in part that the jury must find the defendant "*intended* to aid and abet the perpetrator in committing the crime" in order to find him guilty under an aiding and abetting theory of the crime.  (CT 280) (emphasis added.)  Petitioner fails to demonstrate that the CALCRIM 400 standard instruction as given in his case constituted prejudicial error.

Second, Petitioner asserts that the trial court erred in providing the jury with modified instructions in response to a jury question, as the instruction "did not inform the jury properly on the specific intent required for an aider and abettor to commit the crime of rape in concert." (Pet. at 45.)  Petitioner argues that this error could have allowed the jury to find Petitioner guilty without finding the requisite specific intent.  (Id.)

However, a review of the trial record clearly shows that the trial judge did not provide a modified instruction in response to the jury questions. Instead, after conferring with counsel, the trial judge referred the jurors to the given instructions, as follows:

> Members of the Jury:
>
> I believe the following response may answer both of your questions regarding aiding and abetting.
>
> Please read instruction 400 (page 29) carefully to see if that answers your questions. A person may be guilty of a crime either (1) if he or she directly commits it, or (2) if he or she aids and abets a person who directly commits it. The requirements that must be considered before a person may be found guilty as an aider and abettor are contained in instructions 401 and 402 (pages 30-33).
>
> If this response and the instructions do not answer your questions, please feel free to ask another question.

(CT 321.) Again, the trial judge's response did not constitute a "modified instruction." Instead, the trial judge repeated specific language from CALCRIM 400 and referred the jurors to that instruction, as well as other provided jury instructions relevant to their inquiry, CALRIM 401 and 402, which clearly outlined the elements that must be proven prior to finding a defendant guilty under either a direct perpetrator or aiding and abetting theory of the crimes. Moreover, Petitioner's assertion that the trial judge failed to properly instruct the jury on the specific intent required for aiding and abetting is without basis, as the record clearly shows that the trial judge specifically referred the jurors to CALCRIM 401, which instructed in part that, "Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." (CT 280.) Again, Petitioner fails to show that the given instructions or the trial judge's response to the jurors' questions, constituted error, much less that it amounted to error which prejudiced the outcome of Petitioner's trial.

Finally, Petitioner argues that due to an error in the CALCRIM 1001 instruction, the "jury was permitted to find [Petitioner] guilty by an instruction that essentially omitted an essential element of secondary criminal liability, namely, the omission of the statutory requirement that one both aid <u>and</u> abet the perpetrator in order to be an aider and abettor." (Pet. at 46.)

13cv1017

Again, a review of the jury instructions reveals no error. The given instructions on rape in concert included the following enumerated elements:

> One, the defendant personally committed forcible rape and voluntarily acted with someone else who aided and abetted its commission, or the defendant voluntarily aided and abetted someone else who personally committed forcible rape.

(RT 1003.) Moreover, the jurors were specifically instructed that, "To decide whether the defendant or Tommy Nguyen aided and abetted rape, please refer to the separate instructions that I have given you on aiding and abetting." (Id.) Meanwhile, the instructions for aiding and abetting included the following enumerated elements:

> Three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime.

> And, four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of that crime.

(RT 963-64.) As it is apparent that the jury was clearly and explicitly directed, throughout the jury instructions, that a defendant must both "aid and abet" the crime charged in order to be found guilty of aiding and abetting, Petitioner fails to demonstrate that the given instructions erred in omitting that same requirement.

Moreover, as discussed above in Claim One, despite Petitioner's assertion that he "was convicted on an aiding and abetting theory," and the alleged instructional error was thus prejudicial, it is clear that the evidence is sufficient to support his conviction for rape in concert under either or both theories of the crime, as either an aider and abettor to Tommy Nguyen's rape of H.P., or as the principal perpetrator, for personally committing the forcible rape of H.P. Indeed, the state appellate court specifically and accurately noted that: "The jury was fully apprised of Sellers's role in the rape, in comparison to Tommy's role. Consequently, the jury acquitted him of those rape charges involving Tommy." (Lodgment No. 6, People v. Sellers, No. D058346, slip op. at 16.) Particularly given the breadth of evidence supporting Petitioner's conviction for rape in concert under either or both theories of the crime, Petitioner fails to demonstrate that the purported instructional errors he identifies "so infected the entire trial that the resulting conviction violated due process." See Estelle, 502 U.S. at 72; Henderson, 431 U.S. at 154; Cupp, 414 U.S. at 147.

Even were the Court to assume the existence of instructional error, given that the challenged jury instructions must be viewed "in the context of the overall charge," Petitioner fails to demonstrate that any such error had a "substantial and injurious effect or influence in determining the jury's verdict." Boyde, 494 U.S. at 378, quoting Cupp, 414 U.S. at 417; Brecht, 507 U.S. at 627. Accordingly, the Court cannot conclude that the state court's denial of this claim was contrary to, or an unreasonable application of, clearly established federal law, nor that it was based upon an unreasonable determination of the facts. Williams, 529 U.S. at 412-13. The Court recommends **DENYING** habeas relief as to Claim Two.

## C. Claim Three - Trial Court's Denial of Motion for New Trial Based on Juror Misconduct

Petitioner contends in Claim Three that the trial court erred in denying his motion for a new trial based on juror misconduct because the court "failed to make an adequate inquiry by failing to ask Mr. Figueroa directly about the comments he heard made by five jurors during the case." (Pet. at 51.) Respondent asserts that the trial court conducted a reasonable inquiry once the report was made by questioning the jurors, which uncovered no evidence of misconduct, and by admonishing the jurors to refrain from discussing the case or from forming or expressing any opinion on it. (Ans. Mem. at 31.) Respondent maintains that the trial court was "not required to hold a hearing and take testimony" from Mr. Figueroa, and in any event, Petitioner fails to demonstrate that this alleged error had any effect on the verdict. (Id.) Respondent maintains that the state court's rejection of this claim on the merits was not contrary to, nor an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts. (Id. at 29.)

### 1. Factual Background Pertinent to Claim Three

During the trial proceedings, Petitioner's defense counsel informed the trial court and counsel that Petitioner's stepfather, Ervin Rosario Figueroa,[3] had informed him that during the

---

[3] In the trial transcripts, Petitioner's stepfather is referred to as Mr. Ervin Rosario, while at post-trial proceedings, he is referred to as Mr. Figueroa. (See RT 487, 1170.) In the declaration which accompanied Petitioner's motion for a new trial, he identifies himself as Ervin Rosario Figueroa. (See CT 340.) The Court will refer to him as Mr. Figueroa.

13cv1017

prior day's lunch break, Figueroa overheard a female juror in the hallway make the comment, "but the condom was there." (RT 487-88.) Defense counsel stated that Mr. Figueroa could not identify the individual in question, but stated that the voice came from a group of jurors on a bench right outside the courtroom where Petitioner's trial was being conducted. (RT 488.) Defense counsel requested that Mr. Figueroa repeat this information for the record and requested the trial court inquire of the jurors whether they had been discussing the case. (Id.) The prosecutor noted that "there is another jury out as well," but agreed that inquiry was appropriate. (RT 488-89.) The trial court told defense counsel that it was "happy to accept your proffer as to what Mr. [Figueroa] told you," and concurred that inquiry was appropriate. (RT 489.) The trial court proceeded to separately inquire of each juror and alternate juror where they were standing during the prior day's lunch recess and whether they had heard the remark in question, to which each individual answered in the negative. (RT 489-518.) The trial judge also specifically reminded each juror and alternate juror of the importance of refraining from discussing the case, or from forming or expressing any opinion on it; each juror affirmatively expressed the ability and willingness to follow the court's instructions. (Id.)

After the juror inquiries, the trial judge and counsel discussed other trials that were taking place in the vicinity. The trial judge noted that there was a "288 case[4] going on next door," a bailiff remarked that a "SVP case"[5] was also taking place nearby, and the prosecutor stated that another jury panel was nearby the prior day "so there were a large number of jurors standing around." (RT 518-19.) The bailiff also indicated that there were "approximately 100 jurors, your honor, in the hallway yesterday afternoon." (RT 519.) The trial judge reasoned that "because the remark did seem to, as related, to have a remarkable specificity to this case," inquiry had been appropriate, but concluded that: "I have no evidence, however, that any of these jurors heard it. [¶] And if there was one who perhaps heard or said it, I think that the

---

[4] Section 288 appears to refer to a case involving lewd acts, as noted by the California Court of Appeal opinion. (See Lodgment No. 6, People v. Sellers, No. D058346, slip op. at 17); see also Cal. Penal Code ¶ 288.

[5] SVP refers to a case involving a sexually violent predator, as noted by the California Court of Appeal. (See Lodgment No. 6, People v. Sellers, No. D058346, slip op. at 17.)

1    message as [sic] been effectively communicated that that kind of conduct is not to be repeated

2    and that it's not to be considered during deliberations."  (Id.)

3          After his conviction, Petitioner filed a motion for a new trial, which included the

4    contention that he was denied a fair trial due to juror misconduct. (CT 328-39.) The motion was

5    accompanied by the signed declaration of Ervin Rosario Figueroa.  (CT 340.)   In that

6    declaration, Mr. Figueroa provided additional details, stated the comment came from a female

7    among a group of "at least 4 women and 1 man" in the hallway outside the courtroom, but that

8    "I had no idea who the group were [sic] since it was the first day I was in this building so I did

9    not think anything of it when I heard the condom comment."  (Id.)  However, he "later realized

10   the group was part of the jury on the case of People v. Kevin Sellers when I saw them going into

11   department 48 and in the jury box."  (Id.)  Mr. Figueroa stated that after this realization, he told

12   Petitioner's attorney what he overheard, who told him he might have to go in front of the judge

13   to recount the incident.  (Id.)  Mr. Figueroa was later informed by defense counsel that he did

14   not need to speak to the judge, who had accepted the statement of defense counsel.  (Id.)  In the

15   motion for a new trial, Petitioner asserted that the trial court should have first conducted a

16   hearing with Mr. Figueroa prior to the juror inquiry, in order to gather more detail about the

17   comment he heard and obtain a description of the person who said it.  (CT 335.)

18         At the sentencing hearing, the trial judge denied the motion for new trial and reiterated

19   the steps taken after defense counsel raised the juror misconduct issue, stating in relevant part:

20         I recall that when this issue was raised by trial counsel, I thought, given the
           seriousness of the case, that it was appropriate to accept those representations that
21         [defense counsel] made with respect to what he had been told by Mr. Figueroa.
           I thought that a meaningful inquiry of the jurors required me to speak with them.
22
23         I did that.  I think I did that with some detail. I heard no response from a
           juror - - any of the jurors - - that made me think that the information had even
           been received by them.
24
25         I also believe I reminded them on more than one occasion that their duty
           is the judge the case based on the evidence that's received in this courtroom and
26         not from any other source.  Now, certainly, if they received some other
           information that it's not reasonable to expect them to put aside, then that
           admonition may not be sufficient.
27
28         I found then and I find now that there was no such information received by
           the jurors at all.  Moreover, I believe that I reminded them of their duty to

26                                                                          13cv1017

disregard any information that they might get other than evidence in this court. I know we talked about that with respect to media coverage.

I have, frankly, no basis in the record or in my memory to conclude that there was any misconduct by the jurors at all, let alone prejudicial misconduct. My sense of the case is that these jurors took seriously their oath and their duties to follow the law.

I'll talk about the sufficiency of the evidence in just a moment, but I think it's pertinent at this stage as well on the question of prejudice, even if there were error, I find there is no prejudice. I find there is no error, but - - or no misconduct, but certainly nothing that would be prejudicial.

To the extent that this motion is premised on possible juror misconduct or receipt or reliance upon information not in the record, or being influenced by a comment other than by a deliberating juror or a witness or counsel during argument, there is no basis to believe that that happened.

(RT 1175-76.)

## 2.   **State Court Decision**

Petitioner raised this claim in a petition for review before the California Supreme Court, which denied the petition without comment or citation to authority.  (See Lodgment No. 7 at 30-37; Lodgment No. 8.)  As before, the California Court of Appeal issued the last reasoned decision on this claim and the Court must "look through" to that appellate opinion.  Ylst, 501 U.S. at 806.  The state appellate court denied the claim, stating in part:

Sellers moved for new trial on grounds of juror misconduct, but the court denied the motion, ruling it had interviewed each juror individually, and admonished them not to consider evidence heard outside of trial.  It concluded, "So I don't think that there was any issue of jury misconduct.  There was not any evidence that these jurors had engaged in any kind of juror misconduct."

For a juror to decide a case before it is submitted is misconduct. Accordingly, the court's further inquiry was reasonable.  (See *People v. Barnwell* (2007) 41 Cal.4th 1038, 1054 [juror note about possible juror misconduct due to bias against police officer testimony required the court to conduct a hearing].) Whether and how to investigate an allegation of juror misconduct falls within the court's discretion.  (*People v. Alexander* (2010) 49 Cal.4th 846, 927.)  Although a court should exercise caution to avoid threatening the sanctity of jury deliberations, it must hold a hearing when it learns of allegations which, if true, would constitute good cause for a juror's discharge.  (*People v. Lomax* (2010) 49 Cal.4th 530, 588.)  Failure to do so may be an abuse of discretion.  (*Ibid.*)  "In determining misconduct, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'" (*People v. Collins* (2010) 49 Cal.4th 175, 242.)  We review independently whether those facts constitute misconduct.  (*Ibid.*)

Sellers contends the trial court should have first allowed his stepfather to provide the court with an exact description of the juror and her statements, to

enable the court to interview the jurors more in depth.  He speculates, "It is reasonable to think that the juror who either said or heard the comment would be somewhat frightened at the prospect of being brought back into the court to discuss an issue of misconduct. They may have felt that they were 'in trouble' for something.  [¶]  The jurors' denial that [the court's inquiry regarding possible misconduct affected them] could not be taken seriously as the nature of the discussion would tend them [*sic*] to experience unconscious bias."

We conclude the trial court did not err in resolving the claim of jury misconduct.  It was not necessary for the court to give Sellers's stepfather an opportunity to address the court because the court assumed the truth of his claim he had overheard a juror's comment regarding the condom. The court interviewed each juror, and all denied hearing the comment.  The court further instructed each juror not to rely on such comments.  Substantial evidence supported the trial court's underlying factual findings establishing there was no jury misconduct; accordingly, the trial court did not err in denying Sellers's motion for a new trial.

(Lodgment No. 6, People v. Sellers, No. D058346, slip op. at 17-19.)

### 3.   Merits

"[T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961).  "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  Smith v. Phillips, 455 U.S. 209, 217 (1982).  "Under Supreme Court precedent, the remedy for allegations of juror misconduct is a prompt hearing in which the trial court determines the circumstances of what transpired, the impact on the jurors, and whether or not the misconduct was prejudicial."  Bell v. Uribe, ___ F.3d ___, 2013 WL 4750069, *8 (9th Cir. Sept. 5, 2013), citing Smith, 455 U.S. at 216-17; Dyer v. Calderon, 151 F.3d 970, 974-75 (9th Cir. 1998) (en banc).

In Claim Three, Petitioner asserts that the trial court erred by failing to talk to Mr. Figueroa prior to the juror inquiry, speculates that Mr. Figueroa could have provided additional detail to identify the individual who uttered the comment, and contends that the trial court could have then conducted a more "in-depth hearing" with the jurors.  (Pet. at 59.)  Petitioner also speculates that the juror or jurors involved in the incident may have been "frightened" when asked about it and felt they were "in trouble," and asserts that: "The jurors' denials that this affected them and they could be fair and impartial in judging this case could not be taken

1   seriously as the nature of the discussion would tend them to experience unconscious bias." (Id.)

2   However, a review of Mr. Figueroa's post-trial declaration reveals only that he believed the

3   comments came from a female among a group of "at least 4 women and 1 man," and he did not

4   indicate that he would have been able to identify the specific individual who made the comment.

5   Meanwhile, the state record clearly reflects that once alerted to the overheard comment,

6   the trial judge thoroughly and carefully considered the potential for misconduct.  The trial judge

7   inquired as to the particulars of the overheard comment and explicitly accepted the

8   representations of defense counsel that Mr. Figueroa overheard the comment from a female juror

9   standing with a group outside the courtroom during a lunch break in the proceedings the prior

10  day.[6]  The judge then individually questioned each juror and alternate about whether they had

11  heard the comment in question, and all responded in the negative.  Petitioner fails to demonstrate

12  that the trial judge's decision not to speak directly to Mr. Figueroa prior to questioning the jurors

13  was in error, and fails to offer anything to substantiate the existence of misconduct.[7]  See Dyer,

---

14  [6] The record of trial proceedings reflects that defense counsel emailed all counsel and the
    trial court on the evening of Tuesday, December 1, 2009, stating that Petitioner's stepfather
15  overheard the comment in question during the lunch break in the proceedings that very day and
    informed him of it that evening.  (RT 487.)  On Wednesday, December 2, 2009, the trial judge
16  and counsel discussed the comment on the record, and the trial judge conducted the juror
    inquiry.  (Id.)  Mr. Figueroa's post-trial declaration, which was dated August 1, 2010, indicates
17  that he overheard the comment on Monday, November 30, 2009, and informed defense counsel
    after court on Tuesday, December 1, 2009.  (CT 340.)  Thus, defense counsel indicates he
18  notified the trial court the same day he spoke to Mr. Figueroa, which was the same day Mr.
    Figueroa overheard the remark, while Mr. Figueroa's post-trial declaration states he told counsel
19  of the remark the day after he overheard it.  Irrespective of this discrepancy, it remains clear that
    the trial court, once notified of the possibility of misconduct, made a prompt and thorough
20  inquiry of the jurors regarding the substance of the overheard comments and reminded each juror
    to refrain from forming or expressing any opinion on the case or discussing it prior to
21  deliberations.

22  [7] In the federal Petition, Petitioner cites to both the trial transcript and the declaration of
    Mr. Figueroa, which contain discrepancies between Mr. Figueroa's observations and defense
23  counsel's proffer to the trial court, namely, the date on which Mr. Figueroa overheard the
    comment, as discussed in footnote 6 above, and that Mr. Figueroa specifically indicated that the
24  group of jurors involved in the incident were jurors on Petitioner's case, as opposed to defense
    counsel's statement that the jurors in question were in the hallway just outside the courtroom.
25  It is clear that a "district court must construe pro se filings liberally." Allen v. Calderon, 408
    F.3d 1150, 1153 (9th Cir. 2005); Zichko v. Idaho, 247 F.3d 1015, 1020 (9th Cir. 2001).  The
26  facts presented, liberally construed, appear to state a claim of ineffective assistance of counsel
    based on trial counsel's alleged failure to accurately relay Mr. Figueroa's observations to the
27  trial judge.  Petitioner did not file a state habeas petition before the California Supreme Court
    raising a claim of ineffective assistance of counsel.  However, even if the federal basis of the
28  claim was not properly presented to the state court, it appears that Petitioner no longer has state

151 F.3d at 974-75 (With respect to a hearing necessitated by a claim of potential juror bias, "due process requires only that all parties be represented, and that the investigation be reasonably calculated to resolve the doubts raised about the juror's impartiality.")  As such, Petitioner fails to show that the trial judge's manner of conducting the inquiry into potential misconduct was erroneous, much less that it amounted to error of constitutional dimension, and ultimately fails to demonstrate that there was juror misconduct in his case.

With respect to the assertion of possible juror bias due to the possibility that jurors engaged in premature deliberations, the Ninth Circuit has stated that "such an exchange, though not necessarily proper, is not as serious as 'private communication, contact, or tampering . . . with a juror during a trial [or] . . . influence of the press upon the jury," and has indicated that "[w]hat is crucial is 'not that jurors keep silent with each other about the case but that each juror keep an open mind until the case has been submitted to the jury.'" Davis v. Woodford, 384 F.3d 628, 652 (9th Cir. 2004), quoting United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974). Unlike in Davis, where the judge denied a request for a hearing on potential juror misconduct, the trial judge in Petitioner's case, once alerted to the possibility of misconduct given the substance of the overheard comment, chose to conduct a prompt inquiry with each individual juror and alternate juror.  See id. ("Although a hearing might have laid to rest any lingering question about premature deliberations or bias, we do not construe the circumstances as

_____

court remedies available with respect to this claim, given that the claim arose out of his trial and post-trial sentencing proceedings, and that it is technically exhausted.  See Cassett v. Stewart, 406 F.3d 614, 621 n.5 (9th Cir. 2005) ("A habeas petitioner . . . meets the technical requirements for exhaustion [when] there are no state remedies any longer 'available' to him.")

Thus, to the extent the Court could liberally construe the facts cited in the federal Petition as presenting a claim of ineffective assistance of trial counsel, in order to prevail on the merits Petitioner must show both that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that "the deficient performance prejudiced the defense."  See Campbell v. Wood, 18 F.3d 662, 673 (9th Cir. 1995), quoting Strickland v. Washington, 466 U.S. 668, 687 (1984). Here, even if the Court assumes, without deciding, that Petitioner's defense counsel was deficient for failing to adequately present the jury misconduct issue, Petitioner fails to demonstrate that the error had any effect on the outcome of his case.  See Strickland, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.")  This is because, as explained herein, the trial court conducted an inquiry of all the jurors and alternates, found no evidence of misconduct, and, in an abundance of caution, re-instructed the jurors not to discuss the case prior to deliberations and to limit their consideration to testimony or evidence received in court.

mandating a hearing then or now.")  Again, in Petitioner's case, the trial judge's inquiry did not uncover any evidence that the jurors had engaged in premature deliberations, nor did it reveal any indication of bias against Petitioner.  In fact, upon the court's admonition, each juror and alternate affirmed that they would refrain from forming or expressing an opinion about the case and would consider only the evidence introduced in court.

Moreover, even were Petitioner able to establish the existence of misconduct, he fails to demonstrate that the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 627; see Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000) (applying the Brecht harmless-error standard of review to a claim of juror misconduct); Cook v. LaMarque, 593 F.3d 810, 827 (9th Cir. 2010) (same).  This is because the state record clearly reflects that the trial judge, after individually examining each juror and alternate juror and finding no evidence of misconduct, re-admonished the jurors to refrain from consideration or discussion of the case and to limit their consideration to testimony or evidence received in court.  In response, each juror and alternate juror explicitly affirmed their ability and willingness to follow the court's instructions.  A jury is presumed to understand and follow the trial court's instructions.  Weeks v. Angelone, 528 U.S. 225, 233 (2000); Richardson v. Marsh, 481 U.S. 200, 211 (1989); see also Brown v. Ornoski, 503 F.3d 1006, 1018 (9th Cir. 2007) ("The trial court properly instructed the jury to disregard any extraneous comments and to decide the case based only on the evidence at trial; juries are presumed to follow the court's instructions.")

Accordingly, Petitioner fails to demonstrate that the state court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, nor that it was based upon an unreasonable determination of the facts.  Williams, 529 U.S. at 412-13; Smith, 455 U.S. at 217; Dyer, 151 F.3d at 974-75.  This Court recommends **DENYING** habeas relief on Claim Three.

## VI.    CONCLUSION AND RECOMMENDATION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition and dismissing this action.

**IT IS ORDERED** that no later than **November 11, 2013**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **November 25, 2013.**  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED: October 25, 2013

Peter C. Lewis
U.S. Magistrate Judge
United States District Court

13cv1017